UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 16 CR 108 |
| v. | ) | |
| | ) | Hon. Charles R. Norgle, Sr. |
| | ) | |
| COLLIN COON | ) | |

**GOVERNMENT'S OBJECTIONS TO THE PRESENTENCE
INVESTIGATION REPORT**

A Presentence Investigation Report (PSR), a supplemental PSR, and a second supplemental PSR were filed by the probation department in this case. (Docket Entries 65, 69, 74). The defense filed objections to the PSR (Docket Entry 76) and the government submitted a Supplemental Version of the Offense with several exhibits, which are referenced below. (Ex.'s A-O). The government respectfully requests that the Court amend the PSR consistent with the government's objections and positions.

**A. Paragraph 4 - Arrest Date**

Paragraph 4 of the PSR contains a typographical error that reflects defendant Collin COON was arrested on "February 24, 2017." Paragraph 4 should, as the defense also points out, be amended to list the correct arrest date of "February 24, 2016." (Def. Obj. 3).

**B. Paragraph 13 - Offense Conduct**

In the third and fourth sentences of paragraph 13 of the PSR, the probation department referenced certain historical information regarding defendant that is not directly related to the offense conduct in this case. The government has no objection

1

to the defense's request that the third and fourth sentences of paragraph 13 be stricken from the PSR for purposes of this sentencing hearing.[1] (Def. Obj. 3-4).

### C. Paragraph 18 - Base Offense Level

In paragraph 18 of the PSR, the probation department determined that the base offense level is 14, pursuant to Guideline § 2K2.1(a)(6)(B). It is the government's position that the base offense level is 20, pursuant to Guideline § 2K2.1(a)(4)(A), since defendant committed the instant offense subsequent to sustaining a conviction for a crime of violence, namely attempted robbery.[2] The defense argues that the offense of attempted robbery does not "meet the elements of a crime of violence" and that it is "possible" that such an offense could be committed without any "threatening, forceful, or violent" substantial steps taken. (Def. Obj. 15-18).

In Illinois, "[a] person commits robbery when he . . . knowingly takes property . . . from the person or presence of another by the use of force or by threatening the imminent use of force." 720 Ill. Comp. Stat. 5/18-1(a); *see also Van Sach v. United States*, 2017 WL 4842617 (7th Cir. Sept. 1, 2017) (citing *Curtis Johnson v. United States*, 559 U.S. 133 (2010)) (stating that *Curtis Johnson* "requires that a court consider not only the statute's language but also the level of force Illinois courts

---

[1] In not objecting that the third and fourth sentences of paragraph 13 be stricken, the government does not suggest that the information in such sentences was inaccurate. The government instead maintains that it will not be able to prove such information, at this time, beyond a preponderance of the evidence at the sentencing hearing and therefore the Court should not consider such information in imposing defendant's sentence in this case.

[2] As set forth in paragraph 37 of the PSR, on January 8, 2004, defendant was convicted of attempt robbery, in violation of Chapter 720 Section 5/8-4(a) & Section 5/18-1(a) of the Illinois Compiled Statutes, 2003, in case 03CF1686, in the Circuit Court of Will County, Illinois. (Exs. B, C).

require to sustain a conviction under the robbery statute"). The Seventh Circuit has held that Illinois robbery qualifies as a crime of violence under the elements clause. *See United States v. Smith*, 669 Fed. App'x 314 (7th Cir. 2016) ("convictions under [the Illinois robbery] statute are crimes of violence under the elements clauses of the Guidelines and similarly worded statutes"); *United States v. Bedell*, 981 F.2d 915, 916 (7th Cir. 1992) ("We classified robbery under Illinois law as a per se crime of violence for purposes of sentence enhancement in *United States v. Carter,* 910 F.2d 1524, 1532 (7th Cir. 1990)); *United States v. Dickerson*, 901 F.2d 579, 584 (7th Cir. 1990) (Illinois robbery includes the elements of either "use of force or . . . threatening the imminent use of force'"). Additionally, the Seventh Circuit has explained that the force threshold that the Supreme Court established in *Curtis Johnson* "is not a high one" and that "a conviction under Illinois' robbery statute requires force sufficient to qualify under [*Curtis*] *Johnson*." *Van Sach*, 2017 WL 4842617 at *1 (quoting *United States v. Enoch*, 865 F.3d 575, 583 (7th Cir. 2017)).

While the Seventh Circuit has not directly addressed whether the offense of attempted robbery is a crime of violence under the Guidelines, it recently held that "attempt" offenses qualify as violent crimes under the elements clause to the same extent as the completed crime. *See Hill v. United States*, 877 F.3d 717, 719 (7th Cir. 2017) (stating "[g]iven the statutory specification that an element of attempted force operates the same as an element of completed force, and the rule that conviction of attempt requires proof of intent to commit all elements of the completed crime, we now adopt Judge Hamilton's analysis as the law of the circuit). In *Hill*, the Court

3

explained that "[w]hen a substantive offense would be a violent felony under § 924(e) *and similar statutes*, an attempt to commit that offense also is a violent felony."). *Id.* Since, as explained above, Illinois robbery is a crime of violence under the Guidelines, attempt to commit such an offense also is a crime of violence in this Circuit. *Id.* Accordingly, pursuant to Guideline § 2K2.1(a)(4)(A), it is the government's position that the base offense level should be 20 since defendant committed the instant offense subsequent to sustaining a conviction for a crime of violence, namely attempt robbery. (Ex. B).

### D. Paragraph 21 - Trafficking Enhancement

As discussed below, the defense argues that the "'trafficking of firearms' enhancement is not supported by reliable evidence and therefore should not be applied" in this case. (Def. Obj. 2-3). The Federal Rules of Evidence, the United States Sentencing Guidelines and Seventh Circuit precedent provide for relaxed evidentiary standards at a sentencing hearing. The rules of evidence, for example, do not apply at a sentencing hearing. Fed.R.Evid. 1101(d)(3). In fact, not only do the rules of evidence not apply, but "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. The Sentencing Guidelines echo § 3661: "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a). The Supreme Court has also weighed in, explaining that "a judge may appropriately conduct an

4

inquiry broad in scope, largely unlimited *either as to the kind of information he may consider, or the source from which it may come*." *United States v. Tucker*, 404 U.S. 443, 446 (1972) (emphasis added).

This scope, however, while quite broad, is not entirely without limitation. Courts have held that, at sentencing, the Due Process Clause of the Fifth Amendment supplants the Federal Rules of Evidence, requiring information used at sentencing to be reliable and accurate. *United States v. Guajardo–Martinez*, 635 F.3d 1056, 1059 (7th Cir. 2011); *United States v. Hankton*, 432 F.3d 779, 790 (7th Cir. 2005); *United States v. Conley*, 541 F. App'x 699, 701 (7th Cir. 2013). Stated another way, "facts considered at sentencing must be proved by a preponderance of the evidence." *United States v. Lucas*, 670 F.3d 784, 792 (7th Cir.2012); *see also United States v. Watts*, 519 U.S. 148, 156 (1997) (providing that "application of the preponderance standard at sentencing generally satisfies due process").

The firearms trafficking enhancement, as set forth in Guideline § 2K2.1(b)(5), mandates a four-level increase to the base offense level if the defendant "transported, transferred, or otherwise disposed of two or more firearms to another individual" and, in relevant part, "knew or had reason to believe that [transferring a firearm to another individual] would result in the transport, transfer, or disposal of a firearm to an individual" who could not possess or receive a firearm or "who intended to use or dispose of the firearm unlawfully." U.S.S.G. § 2K2.1 N.13(A). The probation department takes the position that defendant engaged in the trafficking of three firearms in this case and that the four-level increase is therefore appropriate. (PSR ¶

5

21).  The defense does not dispute that defendant sold the three firearms to the confidential source (CS), but alleges that the enhancement should not apply since "there is no direct and reliable evidence" showing that defendant knew that the CS's "possession or receipt of the firearms would be unlawful." (Def. Obj. 20).  The defense describes the firearm purchases as "three isolated private sales involving [defendant] and the [CS]." (Def. Obj. 22). Reliable evidence, from video recordings of the three transactions, proves otherwise. (PSR ¶ 13).[3]

During the first sale, on August 25, 2015, defendant's own comments demonstrated that he knew that the CS's possession of the firearm was illegal and that the CS intended to pass the shotgun on to another person. (Ex. O, 8-25-2015 Clip 1). Notably, when defendant entered the CS's vehicle on August 25, 2015, one of the

---

[3] Unless otherwise noted, the quotations in Section D are taken from clips of the video recordings of the firearms transactions that occurred between defendant and the CS on August 25, 2015, September 16, 2015, and September 23, 2015–all of which were tendered to defense counsel in 2016. Three video and audio clips from these recordings, which are redacted to conceal the CS's identity, have been downloaded to a disk and submitted as part of the Government's Supplemental Version of the Offense. (Ex. O).  Following certain quotations above, are brackets, which reflect the interpretation of certain quoted words and phrases used in these recorded conversations.  The interpretations in these brackets are from a Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) case agent assigned to this case (who is also referenced to by name in the PSR). (PSR ¶¶ 8-13). To the extent that recorded communications are summarized above, those summaries do not include references to all of the topics covered during the course of the conversation that was recorded. In addition, the summaries do not include references to all statements made by the speakers on the topics that are described. The case agent is able to identify defendant and defendant's voice on the recordings based, in part, on the agent's involvement in this case, which included personally interviewing defendant on February 24, 2016 in Joliet, Illinois. The case agent's interpretations above are based on the contents and context of the recorded conversations, a review of the recordings in their entirety, the agent's knowledge of the investigation as a whole, the agent's experience and training, the ATF reports tendered in this case (which reflect debriefing with the CS concerning the three firearm sales), and the experience and training of other law enforcement in this investigation.

first questions he asked the CS was, "how far do we have to go?" When the CS indicated that they would be doing the transaction there, defendant sold the CS the shotgun and took $250 in prerecorded funds from the CS. At that point, defendant told the CS to "tell him [indicating someone other than the CS] don't pull the trigger, I think it's [the shotgun] loaded." Defendant then indicated that he thought it was loaded because he had given "it [the shotgun]" to "dude [another unnamed individual]" before he got it back and sold it to the CS. During the conversation, defendant spontaneously yelled out "Joliet PD,' in reference to a police officer defendant apparently saw nearby. The CS asked defendant why he was so "nervous" about the police. Defendant then looked at the shotgun, which was now in the backseat of the CS's vehicle and in the CS's possession, and stated, "there is nowhere to hide that [the shotgun]." A few moments later, defendant informed the CS that the shotgun was from a house that was "robbed" by an unnamed male and that there were "six or seven more [firearms]." Defendant is then seen on video listening to the CS as the CS informed defendant that if "he [the unnamed male who committed the robbery] wants to sell more of them [firearms], we [indicating the CS and the others the CS was purchasing the firearms for] will take them [firearms] man. I will see what he [indicating one of the individuals the CS was purchasing the firearms for] says about this one [the shotgun] and if he likes them, I could probably pop [purchase] them [other firearms] all off for you. You know?" After the CS made these comments, defendant replied, "mmm mmm."

Approximately three weeks later, on September 16, 2015, defendant sold the CS another firearm. Following that sale, the video of the incident reflects that the CS told defendant that "if you come across any more guns let me know." (Ex. O, 9-16-2015 Clip 2). Defendant then referenced narcotics and told the CS that "Gabe showed me a bad a-- f----- gun last night," and that "[defendant] was "going to buy it." A week later, on September 23, 2015, defendant was with both the CS and an unidentified male. The video recordings reflect that defendant initially showed the CS the third firearm and told him that he had just "busted [shot] that b-----[the firearm]" down the street and that this "b---- [the firearm] is nice and better than the other one [the firearm defendant sold the CS on September 16, 2015]." (Ex. O, 9-23-2015 Clip 3). To prove that defendant had just fired the firearm, defendant then put the barrel of the firearm up to the CS's nose and stated to the CS, "smell that gunsmoke?" The CS took possession of the firearm and defendant discussed narcotics with the CS. The CS paid defendant for the firearm, after which time an unidentified male approached the CS and asked the CS if "that [indicating the firearm defendant had just sold the CS] was for [the CS's] personal [personal use]?" The CS replied, in the presence of defendant, that the CS "was going to flip [resell] it for a $100 extra bucks" at which time defendant laughed out loud and stated, "[the CS] ain't doing this s--- for nothing."

For the reasons set forth above and in the PSR, it is the government's position that the that defendant engaged in the trafficking of three firearms in this case and

that the four-level increase is therefore appropriate pursuant to Guideline§ 2K2.1(b)(5).

### E. Paragraph 29 – Total Offense Level

In paragraph 29 of the PSR, the total offense level is listed as 21. (PSR ¶ 29). For the reasons set forth in the PSR, as amended above, it is the government's position that the total offense level should be 27. (PSR ¶¶ 18-29).

### F. Paragraphs 36 & 37 – Prior Convictions

In paragraphs 36 and 37 of the PSR, the probation department addressed defendant's sentences for his conviction for unlawful possession of a stolen motor vehicle (PSMV)[4], in case 03CF939, and attempt robbery, in case 03CF1686 (Attempt Robbery). A 2004 transcript of the joint sentencing hearings reflects that, before the court announced its sentence, the court apprised defendant of the potential availability of the Illinois Department of Corrections (IDOC) Impact Incarceration Program (Program);[5] what the program was and that the court could only "recommend" that he be placed in it. (Ex. C 13-14, 22). Defendant signed an

---

[4] According to paragraph 36 of the PSR, on August 23, 2003, defendant was convicted of possession of a stolen motor vehicle, in violation of Chapter 625, Section 5/4-103(a)(1), of the Illinois Compiled Statutes, 2003 in case 03CF939 and sentenced to a period of probation. On January 8, 2004, defendant pled to a violation of probation in case 03CF939 and, as described above, was sentenced to six years' imprisonment. (Exs. A, C).

[5] In Illinois, inmates "may serve their sentences in the 'Impact Incarceration' Program, an alternative to prison styled after the familiar military basic training program, or 'boot camp,' incorporating physical labor, military formation and drills, regimented activities, uniform dress and appearance, as well as education and counseling. *See United States v. Gajdik*, 292 F.3d 555, 556 (7th Cir. 2002), *citing* 730 ILCS 5/5-8-1.1 (Ex. M).

"Offender's Consent to Impact Incarceration" form, which stated, in pertinent part, that:

> "I understand that my commitment to the Impact Incarceration Program is entirely dependent upon the decision of the Department of Corrections. I understand that I have been recommended by the Court for this program but may not be accepted by the Department of Corrections for participation in the Impact Incarceration Program."

(Exs. D, E). As reflected in the transcript and certified copies of conviction, defendant was sentenced in case numbers 03CF939 and 03CF1686 to six years' imprisonment. (Exs. A, B, C 22-28). The court ordered that the sentences be served concurrently and, in each case, also recommended that defendant be placed into the Program. *Id.* Defendant was accepted into the Program by the IDOC the following month and successfully completed it on or about June 4, 2004. (Ex.'s F, G). Roger E. Walker, the then Director of the IDOC, signed and sent a certification notice to the court, dated September 23, 2004, which stated that in "[a]ccordance with the sentencing order of this court, [d]efendant's sentence shall be reduced to time considered served as of 06/04/2004." *Id.*

Approximately 13 years later, defendant filed motions to "correct" the sentencing orders, in cases 03CF939 and 03CF1686, in the Circuit Court of Will County, Illinois. (Def. Obj. 5-8); (Docket Entry 76-4). In each of the motions, defendant requested that the court enter supplemental sentencing orders that included more detail about the Program, specifically language stating that the "sentence shall be reduced to time considered served upon certification to the court by the [IDOC] that the offender has successfully completed the [P]rogram." *Id.* On January 12, 2018,

10

without vacating any of the prior sentencing orders in cases 03CF939 and 03CF1686, a different Will County Judge than the Judge who originally sentenced defendant entered supplemental sentencing orders for each such case, *nunc pro tunc* to the date of January 8, 2004. (Ex. I, J, K). In entering the orders, the court indicated that the supplemental orders were "just more detailed" and admonished the defense that "[it] is not changing any outcome" and that "[i]t is not changing anything." (Ex. H 7-8).

In paragraphs 36 and 37 of the PSR, the probation department initially took the position that defendant's six year sentences, in cases 03CF939 and 03CF1686, should not be awarded criminal history points under the Guidelines since both sentences were reduced to time considered served on June 6, 2004. (PSR ¶¶ 36-37; Supp. PSR).[6] The probation department then reversed its position on this issue and determined that defendant's sentences would receive criminal history points since, according to *United States v. Womack*, 610 F.3d 427 (7th Cir. 2010) and *United States*

---

[6] The probation department cited to the "Federal Sentencing Guidelines Handbook 2016-2017 Edition (Handbook)" under a section entitled "Guideline §4A1.2, paragraph (b) – Sentence of Imprisonment," which stated that "where the sentencing court later reduces the sentence upon reconsideration, the reconsidered sentence governs." (Supp. PSR 1-2); (Ex. L). Probation provided the government a copy of the Handbook pages referenced in support of that position, which cited *United States v. Kristl*, 437 F.3d 1050, 1056 (10th Cir. 2006). In *Kristl*, unlike defendant's case, a Colorado state court judge pronounced two sentences for a defendant convicted of possessing a controlled substance, namely the "original sentence" and a "reconsidered sentence" one year later. *Id*. The supplementary PSR also implied that the United States Sentencing Commission (Commission) weighed in on this case and took certain "position[s]" as to how to interpret a reduced sentence under the Guidelines. (Supp. PSR 1-2). On March 15, 2018, both the government and the probation department subsequently contacted Ms. R. Pierce, a staff member at the Commission, who had previously briefly communicated with the probation department during the preparation of the PSR in this case. According to Ms. Pierce, prior communication she previously had with the probation department regarding this case was for advice purposes only and in no way was intended to be taken as official positions of the Commission.

*v. Gajdik*, 292 F.3d 555 (7th Cir. 2002), criminal history points are based on the sentence pronounced–six years' imprisonment–and not the length of time actually served. (Supp. PSR 1-5).[7]  In *Gajdik,* the Seventh Circuit considered whether participation in the Program by a defendant acted to reduce a prior sentence of imprisonment for purposes of determining criminal history points. *Gajdak,* 292 F.3d at 558-60; *see also Womack*, 610 F.3d at 431 (discussing *Gajdik* and stating "[w]e examined the internal workings of U.S.S.G. § 4A1.2 and concluded that 'criminal history points are based on the sentence pronounced, not the length of time actually served'").  In *Womack*, the Court further explained that the Program operates with "limited judicial involvement" and "noted that [IDOC], *not* the sentencing court, determines whether the inmate may participate in the program, whether the inmate successfully completes the program, and thus, ultimately, whether the inmate is released early." *See id*. at 431 (stating "we concluded that time served in the [P]rogram does not reflect the criminal history provisions' focus on judicial determinations of proper sentences") (emphasis in the original).

The defense maintains that the pronounced sentences for defendant's conviction in case numbers 03CF939 and 03CF1686 were only seven months since he successfully completed the Program on June 4, 2004.  (Def. Obj. 13-14).  The defense therefore contends that defendant should not receive criminal history points for

---

[7] In a second supplemental PSR, the probation department took no position regarding criminal history points for the sentences in cases 03CF939 and 03CF1686 and deferred that decision to the Court. (2nd Supp. PSR).

either conviction because the sentences were under thirteen months and fall outside the applicable 10-year time period set forth in Guideline § 4A1.2(e). (Def. Obj. 13-14). The defense further argues that *Gajdik* is distinguishable since, unlike *Gajdik*, the sentencing orders issued in defendant's case "clearly provide that the 'period of imprisonment imposed' was reduced to time considered served by judicial order." (Def. Obj. 13).

This is incorrect. Defendant was sentenced to six years' imprisonment in case numbers 03CF939 and 03CF1686. (Exs. A, B, C). The court recommended that he be placed in the Program, referencing 730 ILCS 5/5-8-1.1, which sets forth what a defendant must accomplish in the IDOC to have his sentence reduced to time considered served. (Ex's A-C; H-K, M). But nowhere, in any of the orders, did the sentencing court state that defendant has been sentenced to time considered served. *Id.* It is the pronounced sentences of six years' imprisonment, and not the benefit of participating in the Program that determines whether convictions should receive criminal history points. *Gajdik*, 292 F.3d at 556-557. This precise situation was addressed in *Gajdik*, where three criminal history points were assigned to defendant's prior state court burglary sentence of five years even though the state court had subsequently entered an order reducing the five year sentence to time considered served after defendant successfully completed the Program. *See id.*(stating "*Gajdik* successfully completed the [P]rogram in 121 days, and on July 1, 1997, the IDOC certified such to the court, which entered an order reducing his sentence to time served").

13

The *nunc pro tunc* orders, cited to by the defense, do not change the criminal history analysis at this sentencing hearing. (Ex. I, J, K). The pronounced sentences for defendant's convictions, in case numbers 03CF939 and 03CF1686, were and remain six years' imprisonment. (Exs. A, B, C, H).

For the reasons set forth in the PSR, as amended above and in the Supplemental PSR, it is the government's position that defendant receives three criminal history points for his PSMV conviction in case 03CF939 and three criminal history points for his Attempt Robbery conviction in case 03CF939. U.S.S.G. §§ 4A1.1(a); 4A1.2(e)(1) and (k)(2)(A).[8]

### G. Paragraphs 50 and 52 – Criminal History Computation

In paragraph 50 of the PSR, the subtotal criminal history category score is listed as six. (PSR ¶ 50). For the reasons set forth in the PSR, as amended above, it is the government's position that the subtotal criminal history category score is twelve. In paragraph 52 of the PSR, the criminal history category is listed as IV. (PSR ¶ 52). For the reasons set forth in the PSR, as amended above, it is the government's position that the criminal history category is VI.

### H. Paragraph 100 – Guideline Provisions

In paragraph 100 of the PSR, the total offense level is calculated at 21; the criminal history category is listed at IV; and the guideline imprisonment range is 57 to 71 months. (PSR ¶ 100). For the reasons set forth in the PSR, as amended above,

---

[8] According to the PSR and the IDOC, the date of defendant's last release of incarceration from the IDOC, in both cases 03CR939 and 03CF1686, was January 11, 2008. (PSR ¶¶ 36-37); (Ex. N).

it is the government's position that the total offense level is calculated at 27; the criminal history category is listed at VI; and the guideline imprisonment range is 130 to 162 months. However, pursuant to Guideline § 5G1.1(a), because the statutory maximum penalty for the offense of conviction is 10 years' imprisonment, the applicable advisory guideline sentence is 120 months.

**Conclusion**

For the foregoing reasons, the government respectfully requests that the Court amend the PSR consistent with the government's positions set forth above.

Respectfully Submitted,

JOHN R. LAUSCH, JR.
UNITED STATES ATTORNEY

By:    */s/ William Dunne*
WILLIAM DUNNE
Assistant United States Attorney
United States Attorney's Office
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

Dated: April 23, 2018

15